**AFFIRM; and Opinion Filed July 10, 2013.**



In The

**Court of Appeals**

**Fifth District of Texas at Dallas**

### No. 05-11-01640-CR

**TONY ARNELL WILLIAMS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 3**
**Dallas County, Texas**
**Trial Court Cause No. F10-57510-J**

## OPINION

Before Justices FitzGerald, Fillmore, and Richter[1]

Opinion by Justice Richter

A jury convicted Tony Arnell Williams of capital murder. In a single issue on appeal, he challenges the legal sufficiency of the evidence against him and the evidence corroborating the accomplice witness testimony in the case. We affirm the trial court's judgment.

### Background

In the early morning hours, a group of men robbed the deceased at a bank while he was working as a money courier for a club. One of the men shot and killed the deceased when he appeared to be reaching for a weapon. An accomplice to the robbery, Kenneth Rodgers, confessed to police about his involvement after his sister Teresa Rodgers told police that Kenneth and her boyfriend, Shannon Sloan, had committed the crime. Kenneth also implicated

---

[1] The Honorable Martin E. Richter, Retired Justice, sitting by assignment.

appellant in the offense, stating that appellant had been the shooter. Video footage from the bank and from a neighboring McDonalds and Chevron station were admitted into evidence. The video of the actual robbery does not clearly reveal the face of the shooter, but appears to show that the shooter was wearing dark baggy clothing and white shoes. The video shows three assailants and the shooter firing into the right side of the deceased's body with his right hand. Video from the Chevron station shows appellant specifically, wearing baggy black clothing with a white shirt underneath a black one and white shoes with black markings.

The medical examiner concluded that the cause of the deceased's death was a single gunshot wound to the deceased's arm that traveled into his trunk. A single Winchester 9 millimeter cartridge case was found at the scene, but the murder weapon was never recovered. Cell phone records collected from the vicinity of the murder showed that appellant and the two other accomplices had called each other after the robbery was complete. The evidence showed appellant had called Sloan and Sloan had called appellant, though neither reached the other. There were also three completed calls between Sloan and Rodgers during the same span of time.

Kenneth Rodgers, appellant's accomplice, testified for the State. He stated that in 2007 he became acquainted with the deceased when he worked at a car dealership where the deceased had purchased a car for his daughter. Rodgers discovered that the deceased worked as a money courier for a local strip club and he told his sister's boyfriend, Shannon Sloan, about this fact. Sloan said that he thought robbing the deceased would be a good way for Rodgers to be able to repay him some money he owed. A couple of months later, Rodgers, Sloan, and appellant tried to rob the deceased in December 2007 but they failed because they were not at the right place at the right time. Rodgers understood that Sloan and appellant had been following the deceased to try to learn his routine. At that time, Rodgers knew appellant only as "Snoop."

–2–

In January 2008, they attempted to rob the deceased again. They went to the bank where they knew the deceased was going to make his deposits. Rodgers was swearing black pants, black shoes, a brown striped shirt, and a mask. Sloan was wearing black and a mask as well. Rodgers could not recall what appellant was wearing, but he remembered appellant having something around his face to disguise him. Sloan armed all three men with guns. According to Rodgers, appellant had a nine millimeter pistol, while Sloan had a shotgun and Rodgers had a .45 pistol. Rodgers stated that Sloan told the others which gun was which as he passed them out.

The men hid in an enclosed area for a trash Dumpster near the bank deposit area. They waited with loaded guns for approximately twenty minutes for the deceased to arrive. When the deceased pulled up to the drop box, he pulled some crates out of his truck before the men converged on him. When he turned toward them, it appeared to Rodgers like the deceased was reaching for his weapon. At that point, according to Rodgers, appellant fired a single shot and the deceased fell to the ground. Sloan and appellant gathered up the deceased's things in their hands and fled from the scene. Rodgers stayed and took the deceased's gun and keys. He then moved the deceased's truck. As he was driving, he threw his gun and the deceased's gun out the window so he would not be caught with them. He parked the truck in an alleyway near his apartment and called his sister, Sloan's girlfriend, to find out where Sloan and appellant had gone. She put Sloan on the phone immediately.

Sloan arrived at Rodgers's apartment without appellant and took the keys to the deceased's truck. He parked it a mile or two further away from Rodgers's apartment. When Sloan returned, he and Rodgers counted the money, which amounted to around $15,000 in cash. Sloan gave Rodgers $5,000 and said he was going to give "Snoop" some of the money. The two proceeded to a house, and Sloan went inside with money in his hands. Rodgers presumed that Sloan was giving appellant some of the money at that time. Rodgers stayed in the car, then

several minutes later, Sloan came out of the house and he and Sloan left. Rodgers claimed he had no idea what happened to the rest of the money from the robbery.

DNA evidence linked Rodgers to the steering wheel and stereo of the deceased's truck. When Rodgers was first questioned by police, however, he denied any involvement in the robbery. It was not until after he was indicted that he agreed to cooperate with the police. He identified appellant as "Snoop" from a photo lineup and also incriminated Sloan. At trial, he identified himself, Sloan, and appellant on the surveillance recording from the bank.

Rodgers testified that he had a plea deal with the State to testify against appellant in exchange for up to twenty-five years confinement and a guilty plea to a first-degree aggravated felony. Rodgers admitted that the mother of two of his children attempted to bribe Teresa Rodgers to prevent her from talking to police about the murder. He also admitted to previously lying to police about his involvement in the case. Rodgers testified that he had no previous felony or misdemeanor convictions and had never been arrested before he was arrested for the instant offense. He claimed he had not spoken to Sloan since he had been jailed.

Dallas Police Officer Richard Duggan investigated the case. In March 2010, he received a Crime Stoppers tip from Teresa Rodgers implicating Shannon Sloan, Kenneth Rodgers, and a man known as "Snoop" in the crime. Teresa Rodgers indicated that she and Sloan had been dating and living together in January 2008 when the offense occurred. She also revealed that she was Kenneth Rodgers's sister. After researching the phone numbers called and received by Rodgers and Sloan around the time of the offense, Duggan was able to identify appellant as the man known as "Snoop."

Duggan filed a case against a woman named Hanon, Rodgers's current wife, for trying to bribe Teresa Rodgers not to testify against her brother. In June 2010, Duggan received DNA evidence implicating Rodgers. That same month, Rodgers agreed to confess to the crime,

–4–

explain who was involved, and reveal who the shooter had been. He identified appellant from a photo lineup as "Snoop." After Rodgers confessed, appellant was arrested for the crime. In July 2010, Duggan interrogated appellant.

When Duggan questioned appellant, he initially denied any knowledge whatsoever of the capital murder. Later the same day, he asked to see proof that Rodgers had identified him from a lineup. Still denying that he knew anything about the offense, appellant nevertheless claimed he left "way before anything ever happened." Before Duggan accused appellant of being the shooter, appellant brought up an injury to his right hand and claimed he could not have done what Duggan was accusing him of doing. Video from the Chevron station, however, showed appellant making a fist with his right hand.

Appellant eventually claimed that a man named "Quincy" was involved in the offense. None of the group, however, had called anyone on their cell phones but each other after the offense. Duggan was never able to corroborate appellant's claim about the involvement of a Quincy in the offense, and Rodgers testified that no one named Quincy participated in the crime.

When appellant began admitting to his participation in the crime, he maintained that he had been at the bank with a shirt wrapped around his face but abandoned the robbery before it began. Appellant said he went to the neighboring Chevron and then heard sirens as he was walking from the Chevron to downtown. Appellant told Duggan he had been carrying a chrome .45 pistol. He also eventually admitted that he had been aware of the plan to rob the deceased for some time before the date of the offense.

Duggan testified that the time of the offense, according to the bank video, was 6:32 a.m. The time of the 911 call, however, following the shooting was 6:46 a.m. Duggan stated that the time for one of these events had to have been inaccurate because the woman who made the 911 call can be seen in the bank video with the deceased at 6:39 according to that video's clock.

–5–

Appellant can be seen walking into the store on the Chevron video at 6:49:33 and walking out at 6:49:42. Video from a surveillance camera at the Chevron shows the flashing lights of an ambulance at approximately 6:49:38. Video from the drive-through McDonalds attached to the Chevron shows an ambulance going by at 6:48:25. Duggan testified that based on the bank's recording of the offense, the appearance of the 911 caller, and the arrival of paramedics, the ambulance arrived at the scene of the offense approximately seven minutes after the robbery. Duggan further testified that he timed a walk to the Chevron from the bank based on the path appellant told him he took and the walk took six minutes.

Sloan gave Duggan a letter he claimed had been written to him by appellant. DNA evidence linked the letter to appellant and Sloan, and appellant admitted he had written it. Within the letter, appellant said,

> This is how real I am. Yeah, I talked to them hoes. Do you know I made up a totally different thing? A totally different [racial epithet], deny any and everything that had to do with you. I did more for you than I did for myself. Home do you know how dumb I feel?
>
> . . .
>
> The [racial epithet] is selling us out like he an innocent bystander, like . . . you made him do it. You put everything together. The [racial epithet] got down good.

Duggan stated that it was his understanding that Sloan was also getting some kind of deal from the State in exchange for his help with the case against appellant. Sloan did not admit to being a party to the offense until February 2011.

An inmate named Leslie Thompson wrote a letter on appellant's behalf to the district attorney's office. In it, Thompson claimed that Rodgers had told him appellant had not been involved in the murder of the deceased. According to Thompson, Rodgers said he did not want appellant involved in the second robbery after appellant refused to participate in the first robbery attempt, but Sloan insisted that they include him. Thompson testified at trial, claiming he met

Rodgers during a "medical visit" at the jail. He stated that Sloan and Rodgers surprised appellant when they picked him up before the second robbery attempt and that appellant walked away from the scene and was nowhere to be found when they robbed the deceased. Thompson claimed that appellant had told the others he had to use the restroom and then left the scene. Thompson stated that Rodgers never mentioned a fourth participant in the robbery to him.

When questioned about Thompson, Rodgers testified that he knew him but that he never talked to Thompson about the case. Rodgers claimed that Thompson was lying. Thompson had prior convictions for aggravated assault, aggravated robbery, forgery, burglary, conspiracy to commit bank fraud, possession by a firearm by a felon, and robbery. Thompson admitted that he had been two cells away from appellant for three months in jail, but he claimed he never spoke to appellant about the case. He admitted, however, that he and appellant were friends. He also admitted that he had permitted appellant to use his personal identification number for the jail phone when appellant first got to the jail. A detention service officer at the jail confirmed that there was a period of time when there was only one cell between Thompson and appellant. The officer further testified that it was possible for the two to talk to each other through the ventilation system connecting the two cells.

Appellant also testified in his own defense. He testified that he had been shot in the right hand in 2007 and admitted hospital records into evidence to show the injury. The finger that had been injured was his right ring finger. When asked if he had a disability in that hand, he claimed that it sometimes gets numb. Appellant made a fist for the jury.

Appellant claimed he declined to be a part of the first robbery attempt of the deceased because he is not a violent person. The next time, appellant claimed, Sloan and Rodgers called him when they were outside his house and he had no previous knowledge of what was about to occur. He stated that his "conscience started talking to [him]" when they got to the bank.

–7–

In his testimony, appellant admitted to holding a big gun that he was told was a "four-five." He also admitted to covering his face with a black tank top that he had been wearing. He claimed he knew he had to be armed because they knew the deceased was armed and,

> That means there's a possibility of something might happen and in the event that might happen or the events the guy carried a gun, being that he carried a gun, something might happen and then you might have to do something different.

He admitted to hiding behind the Dumpster, but he claimed he hid with Rodgers, Sloan, and a fourth person he did not know. According to appellant he walked away from the Dumpster before the robbery had begun, leaving his gun behind the Dumpster. He then walked to the Chevron station, taking the route he had described to Duggan. Appellant maintained that he heard an ambulance as he was walking from the Chevron station to downtown. He admitted he had talked to Sloan and Rodgers on the phone after the offense but he denied receiving any money from the robbery. He acknowledged that it took eleven hours of questioning before he admitted to being at the scene of the robbery. Appellant testified about the differences between the video surveillance of him at the Chevron station and the video surveillance of the shooter at the bank, drawing distinctions between the shoes shown in each.

On cross-examination, appellant admitted sending a letter to Sloan through a jail guard and including in the letter a reference to making up a totally different person but he asserted that the statement did not pertain to the capital murder. He stated that he did not have much experience with guns, but he acknowledged that he was able to remove the bullets from the gun he held. He was also aware of how to locate the gun's chamber.

**Applicable Law**

In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Dolkart v. State*, 197 S.W.3d 887,

890–91 (Tex. App.—Dallas 2006, pet. ref'd). We defer to the jury's credibility and weight determination in a legal sufficiency review. *Brooks v. State*, 323 S.W.3d 893, 894 (Tex. Crim. App. 2010) (plurality op.).

The accomplice witness rule states that in addition to an accomplice witness's testimony, there must be evidence tending to connect the defendant to the offense. *Dodson v. State*, 268 S.W.3d 674, 677 (Tex. App.—Fort Worth 2008, pet. ref'd) (citing TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005)). The accomplice witness rule is not a true sufficiency test; it merely instructs how to determine sufficiency. That is, the accomplice witness's testimony must be disregarded in determining whether there is other evidence tending to connect the defendant to the offense. The additional evidence does not have to be legally sufficient to sustain the conviction. It need only tend to connect the defendant to the offense. *Dodson*, 268 S.W.3d at 677.

### Sufficiency of the Evidence

In his sole issue, appellant complains that the evidence is legally insufficient to support his conviction for capital murder because the non-accomplice evidence in the case did not amount to sufficient corroboration of Rodgers's testimony to connect appellant to the offense under code of criminal procedure article 38.l4. We disagree. In addition to Rodgers's testimony establishing appellant as the shooter, evidence in the case showed appellant was aware of the plan to rob the deceased and was present at the scene of the murder with a gun and his face covered with a shirt. Video evidence indicated appellant had not fled from the robbery before the shooting as he had claimed and demonstrated that a man dressed similarly to appellant (as he later appeared in the Chevron video) was the man who shot the deceased. Appellant attempted to contact one of his accomplices by phone in the morning hours after the murder. Moreover,

viewing the evidence in the light most favorable to the verdict, the evidence showed appellant made up a fourth accomplice for police in an attempt to bolster his version of events.

The jury in the case heard appellant's arguments for why he could not have been the shooter and the testimony of his fellow inmate Thompson claiming Rodgers had admitted appellant was not present at the time of the shooting. The jury was entitled, however, to assess appellant's credibility in light of his prior criminal record and contradictory statements to police and further entitled to consider the evidence showing appellant and Thompson lived just one cell from one another and were able to communicate clearly through the jail ventilation system. We conclude the testimony of appellant's accomplice was sufficiently corroborated and the evidence against him is legally sufficient to support his capital murder conviction.

We affirm the trial court's judgment.

/Martin Richter/
MARTIN RICHTER
JUSTICE, ASSIGNED

Do Not Publish
TEX. R. APP. P. 47

111640F.U05

–10–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

TONY ARNELL WILLIAMS, Appellant

No. 05-11-01640-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 3, Dallas County, Texas
Trial Court Cause No. F10-57510-J.
Opinion delivered by Justice Richter.
Justices FitzGerald and Fillmore participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 10th day of July, 2013.

/Martin Richter/

MARTIN RICHTER
JUSTICE, ASSIGNED